**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Charles E. KOEN, Defendant-Appellant.**

**No. 91-2267.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 19, 1992.

Decided Dec. 15, 1992.

Frederick J. Hess, U.S. Atty., James Porter, Asst. U.S. Atty. (argued), Office of the United States Attorney, Criminal Div., Fairview Heights, IL, for plaintiff-appellee.

Michael A. Gross (argued), St. Louis, MO, for defendant-appellant.

Before EASTERBROOK and RIPPLE, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

RIPPLE, Circuit Judge.

Charles Koen was convicted by a jury of twenty-four criminal offenses, including arson, mail fraud, misapplication and embezzlement of government funds, and making false representations on a government form. On appeal, he raises five issues: (1) whether the evidence was sufficient to support his conviction for arson and certain mail fraud charges; (2) whether an embezzlement count relating to a 1987 payment for a car lease was properly joined with the other counts in the indictment, and, if so, whether it should have been severed; (3) whether the court erred in not granting Mr. Koen a continuance after his retained counsel withdrew temporarily from trial; (4) whether the court erred in admitting evidence of uncharged "bad acts" under Federal Rule of Evidence 404(b); and (5) whether, during cross-examination of Mr. Koen's wife, the prosecutor impermissibly commented upon Mr. Koen's refusal to testify. For the following reasons, we affirm Mr. Koen's conviction.

## I

## BACKGROUND

Mr. Koen was a founder and the executive director of United Front, Inc. (the United Front), an organization based in Cairo, Illinois, that operated housing and other social service programs. The United Front received a portion of its funding from both the federal and state governments. On the evening of September 18–19, 1985, the Security Bank building in Cairo suffered a serious fire. The United Front operated out of this building, which was wholly owned by Mr. Koen. The evidence indicates that the fire was set intentionally. A state fire investigator who was on the scene testified that the fire had at least three separate points of origin. In addition, traces of accelerant were found in the building. At the time of the fire, Mr. Koen and the United Front were in serious financial distress. Testimony at trial revealed that he and his connected business entities owed almost $300,000. The State of Illinois had also informed Mr. Koen that it was planning to audit United Front records

relating to its administration of a state-funded program.

On August 1, 1989, a grand jury in the Southern District of Illinois indicted Mr. Koen on a number of offenses relating to his management of the United Front and to the Security Bank building fire. He was eventually tried on twenty-four counts, that, for purposes of our analysis, can be grouped into three distinct categories. The charges in the first category, Counts 1, 2, 3, 5, and 6, all alleged that Mr. Koen committed fraud or embezzlement or made misstatements to federal authorities while administering the United Front's programs.[1] We shall refer to these as the "Program Fraud Counts." The second category of charges consists of Count 7, which alleged that Mr. Koen violated 18 U.S.C. §§ 842 and 844(f) by committing arson of the Security Bank building—a building that housed organizations receiving federal financial assistance. The third category of charges, Counts 8 through 25, charged Mr. Koen with committing various acts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 1342. All of the mail fraud counts were based on checks mailed by the building's insurer, United States Fidelity & Guaranty Insurance Company (USF & G), in the course of processing and settling the insurance claim on the building. A jury convicted Mr. Koen on all charges and he was sentenced to twelve years' imprisonment.

Mr. Koen challenges his conviction, alleging that a number of reversible errors occurred during trial. Because each claim of error is attended by a discrete group of facts, we shall set out additional facts relevant to each claim when that claim is discussed.

## II

## ANALYSIS

On appeal, Mr. Koen first claims that the evidence at trial was insufficient to support his conviction for arson and for certain acts of mail fraud. Second, he asserts that the district court erred when it joined Count 5, the embezzlement count dealing with a 1987 payment on Mr. Koen's car lease, with the rest of the counts in the indictment, and then declined to sever it. Third, he argues that the district court erred when it refused to grant a continuance after his retained counsel withdrew temporarily from trial. Fourth, Mr. Koen claims that the court erroneously allowed the government to introduce evidence of uncharged bad acts. Finally, Mr. Koen claims that during his wife's cross-examination, the prosecutor impermissibly referred to Mr. Koen's decision not to testify. We shall deal with each of these issues in turn.

### A. *The Sufficiency of the Evidence*

A defendant attempting to overturn a conviction on the grounds of insufficient evidence bears a heavy burden.

> [W]e must affirm as long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." In making this determination we look to all of the evidence and draw all reasonable inferences from the evidence in the light most favorable to the government. We must affirm unless the record is barren of any evidence, regardless of weight, from which the trier of fact could find guilt beyond a reasonable doubt.

*United States v. Jackson,* 935 F.2d 832, 840 (7th Cir.1991) (quoting *United States v. Atterson,* 926 F.2d 649, 655 (7th Cir.1991), *cert. denied sub nom. Lauralez v. United States,* — U.S. —, 111 S.Ct. 2909, 115 L.Ed.2d 1072 (1991)). Mr. Koen was convicted of twenty-four criminal offenses. On appeal, he claims that insufficient evidence was adduced at trial to convict him of arson and of twelve mail fraud counts relating to USF & G's mailing of checks to

1. Counts 1, 2, and 3 alleged that in 1985 Mr. Koen misapplied property worth $5,000 or more under the care, custody, or control of the United Front, in violation of 18 U.S.C. § 666(a). Count 5 alleged that in 1987 he embezzled government funds in violation of 18 U.S.C. § 641 by using funds provided to the United Front to pay a personal debt on his car lease. Count 6 alleged that in 1984 Mr. Koen made false statements on a Department of Labor form, in violation of 18 U.S.C. § 1001.

claims adjusters, arson investigators, and attorneys.

1. The arson conviction

With regard to the arson conviction, we believe that there was sufficient evidence to support the jury's verdict. At the time of the fire, Mr. Koen was in financial difficulty; he and his related businesses had debts totalling around $300,000. Appellant's Br. at 8. In addition, the State of Illinois had announced that it was planning to audit United Front's records, copies of which were kept in United Front's offices in the bank building. As Mr. Koen admits in his brief, these facts "provided an ample evidentiary basis for the jury to conclude that Koen had a motive for arson...." *Id.* at 51.

Despite this evidence, Mr. Koen contends that he was improperly convicted of arson because the government put forward insufficient evidence that he was involved with burning the bank building. However, much circumstantial evidence connects him to the crime. *See United States v. Lundy,* 809 F.2d 392, 396 (7th Cir.1987) (circumstantial evidence as relevant as direct evidence in establishing guilt or innocence); *see also United States v. Kamel,* 965 F.2d 484, 488 n. 4 (7th Cir.1992) (same). Evidence introduced at trial indicated, among other things, that Mr. Koen had bought his partner's interest in the building shortly before the fire, making himself the sole beneficiary of the building's insurance policy. The building itself was insured for its replacement value—an amount higher than its actual worth. Additionally, testimony was given that the arson was an inside job, done by a person who had knowledge of the building. The portion of the structure where the fire was most heavily concentrated was the area in which the United Front kept its records. Filing cabinets in that room were found with their drawers open. Also, Mr. Koen left Cairo shortly before the fire, and testimony suggested that he took the fire insurance policy covering the building with him on his trip. Tr. at 699–700. Mr. Koen responds in his brief that there are innocent explanations for all of these facts, which do not necessarily support an inference that he was involved with arson. However, this argument misapprehends the limited nature of our review of the jury's verdict. As an appellate court, our task is not to determine whether we would have come to the same conclusion that the jury did; rather, we must decide whether the decision that the jury reached was reasonable. *See Kamel,* 965 F.2d at 489. Having reviewed the record, we conclude that there was sufficient evidence upon which the jury could base Mr. Koen's arson conviction; thus, his conviction on Count 7 must be upheld.

2. The mail fraud convictions

A closer question is whether the evidence was sufficient to support convictions on the challenged mail fraud counts. The indictment alleges that Mr. Koen caused USF & G to send checks through the mail on eighteen separate occasions in furtherance of a scheme to defraud that company. Each mailing constitutes a separate mail fraud count in the indictment. Mr. Koen challenges his convictions based on twelve of these mailings. Each of these mailings transmitted a retainer check from the insurance company to an entity that would assist the company in ascertaining the cause of the fire and therefore would resolve the issue of coverage.[2]

The elements required to support a conviction under the mail fraud statute, 18 U.S.C. § 1341, are: (1) a scheme to defraud and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme to defraud. *Schmuck v.*

2. The mailings at issue are as follows: November 12, 1985, and December 23, 1985, checks sent to Ritcheson Claims Service, an insurance adjuster (Counts 8 and 11); December 11, 1985, and December 17, 1985, checks sent to Pyr Tech, Inc., a fire investigation firm (Counts 9 and 10); March 13, 1986, and June 24, 1986, checks sent to Research Service Bureau, a service USF & G used to help it evaluate the insurance claim (Counts 15 and 17); and January 14, 1986, August 27, 1986, December 17, 1986, December 10, 1987, April 26, 1988, and August 9, 1988, checks sent to Walker & Williams, a law firm retained to help USF & G handle the claim (Counts 13, 18, 19, 20, 24, and 25).

United States, 489 U.S. 705, 721, 109 S.Ct. 1443, 1452, 103 L.Ed.2d 734 (1989); *United States v. Stout,* 965 F.2d 340, 344 (7th Cir.1992); *United States v. Biesiadecki,* 933 F.2d 539, 545 (7th Cir.1991). Under the statute, it is irrelevant that the defendant did not personally mail the letters in question. All that is required is that a defendant cause the mail to be used, which he does when he "acts 'with the knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen....'" *United States v. Kuzniar,* 881 F.2d 466, 472 (7th Cir.1989) (quoting *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954)). However, an essential element of mail fraud is that the mailing must somehow work "in furtherance" of the scheme. *United States v. Dunn,* 961 F.2d 648, 651 (7th Cir.1992); *United States v. Draiman,* 784 F.2d 248, 251 (7th Cir.1986); *see also United States v. Lane,* 474 U.S. 438, 451, 106 S.Ct. 725, 733, 88 L.Ed.2d 814 (1986) (noting that the mailing must be "for the purpose of executing the scheme"). This "in furtherance" requirement is to be broadly read and applied. *Draiman,* 784 F.2d at 251. To meet it, the mailing itself need not be an essential part of the scheme, but must be incident to an essential part of the scheme. *Schmuck,* 489 U.S. at 710–11, 109 S.Ct. at 1447; *United States v. Lennartz,* 948 F.2d 363, 370 (7th Cir.1991). The mailings must be "sufficiently closely related," *United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974), to the illegal scheme that it can be said that they further its accomplishment. By contrast, a mailing that, from a theoretical or factual point of view, is too remote from the defendant's scheme will not support a conviction. *See United States v. Staszcuk,* 502 F.2d 875, 881 (7th Cir.1974), *modified on other grounds,* 517 F.2d 53 (7th Cir.), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975).

A mailing that is not in furtherance of the fraud, but instead works against it will not support a mail fraud conviction. *See United States v. Bonansinga,* 773 F.2d 166, 172 (7th Cir.1985), *cert. denied,* 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986). Case law suggests that, in the context of mail fraud on an insurer, a mailing does not further the illegal scheme, and thus is outside the statute, when it serves to put the defrauded person on notice of the fraud, makes the execution of the fraud less likely, opposes the scheme, or discloses the nature of the fraud. *See United States v. Pacheco–Ortiz,* 889 F.2d 301, 305 (1st Cir.1989); *United States v. Leyden,* 842 F.2d 1026, 1028–30 (8th Cir.1988).[3] In *United States v. Castile,* 795 F.2d 1273, 1280 (6th Cir.1986), upon which Mr. Koen relies heavily, the Sixth Circuit concluded that various letters between the insurance company's attorney and both claims adjusters and fire investigators, generated as part of the insurer's investigation of a fire, could not support mail fraud convictions. The court reasoned that a letter requesting that a previously retained private investigator submit a "detailed report" and "do anything and everything legal and proper to determine the cause of the fire," *id.* at 1279, could not violate the mail fraud statute because it "was not sufficiently closely related to the scheme to bring Castile's conduct within the statute. It certainly did not facilitate concealment of the fraudulent scheme." *Id.* Likewise, letters from adjusters to the insurer's attorney discussing the claim were outside the statute because they furthered the insurance company's in-

3. *See also Maze,* 414 U.S. at 402, 94 S.Ct. at 649 (stating that where scheme had reached fruition subsequent mailings did not further scheme); *Spiegel v. Continental Illinois Nat'l Bank,* 790 F.2d 638, 649 (7th Cir.) (stating that letter alerting victim to scheme was insufficient basis), *cert. denied,* 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986); *United States v. Otto,* 742 F.2d 104, 109 (3d Cir.1984) (stating that letter from investor demanding that defendant honor check was insufficient because it threatened, not promoted, continuation of the scheme), *cert. denied,* 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985); *United States v. LaFerriere,* 546 F.2d 182, 187 (5th Cir.1977) (noting that threatening letter from victim's attorney was not a sufficient basis for mail fraud violation because only likely effect of letter was to further detection or deter continuation of fraud); *see generally United States v. Dick,* 744 F.2d 546, 552 (7th Cir. 1984).

vestigation of the fire and conflicted with the defendant's scheme to defraud the insurer. *Id.* at 1279–80. The *Castile* court characterized in the same way a letter rejecting the insured's proof of claim and accusing him of arson. The court held that the letter could not violate the mail fraud statute because its sole purpose was to defeat, rather than to facilitate, the scheme to defraud. *Id.* at 1280. But the court did note that the investigation could have furthered Castile's fraudulent scheme had it been unsuccessful in finding evidence of his involvement, thereby allowing the insurer to pay the claim.[4] *Id.* at 1279.

By contrast, case law does show that, when the insurer's mailings further the processing of the defendant's claim, they can support a mail fraud conviction. *See United States v. Hollis,* 971 F.2d 1441, 1448 (10th Cir.1992); *United States v. Bortnovsky,* 879 F.2d 30, 40–41 (2d Cir. 1989). Such communications can be said to be "incident to an essential part of the scheme." *Schmuck,* 489 U.S. at 710–11, 109 S.Ct. at 1447. "[C]ourts must consider the full scope of the scheme when determining the sufficiency of the mailing element." *United States v. Ashman,* 979 F.2d 469, 482 (7th Cir.1992). Thus in *Kuzniar,* 881 F.2d at 472, mailings related to scheduling the defendants' depositions and to producing supporting documents upheld a mail fraud conviction. "Had the defendants failed to show up for the depositions which were discussed in the letters or failed to provide supporting documents, the insurance company would not have paid and the scheme would have failed." *Id.* The fact that the taking of the deposition might ultimately result in the unraveling of the illegal scheme was immaterial. *Id.* at 472–73. Likewise, in *Draiman,* 784 F.2d at 252–53, this court, while acknowledging that letters that "conflict rather than promote the scheme" would not qualify, concluded that various mailings processing the defendant's insurance claim could support mail fraud convictions because they furthered the defendant's scheme to collect from the insurer. These mailings included letters from the insurers' attorney to an adjuster indicating that the defendant had been given additional time to submit a revised, detailed statement of loss; letters from the insurers' attorney to the insurers distributing the defendant's proofs of loss; letters setting the time of the depositions of the defendant and one of his witnesses; and letters rejecting the defendant's proofs of loss and requesting clarification. Additionally, the court in *Pacheco–Ortiz* concluded that a letter from an insurance adjuster recommending settlement of a claim, and another letter requesting more documentation so that the settlement could go forward, were "unquestionably ... in furtherance of the illegal scheme.... [T]he letters here, by recommending a settlement to Sun Alliance and by seeking documents needed for the settlement to proceed, clearly furthered the efforts of the cultivators of the scheme to taste the fruits of their labors." *Pacheco–Ortiz,* 889 F.2d at 305–06. Similarly, the Fifth Circuit, in *United States v. McClelland,* 868 F.2d 704, 708 (5th Cir.1989), concluded that a letter from a field adjuster to an insurance company's claims department detailing the defendant's claim could serve as the basis for a mail fraud conviction. Despite the fact that the report contained information that would lead the claims department to suspect that the defendant was involved with the underlying explosion, "[m]ost of the facts contained in ... [the] report are routinely used by insurers in making decisions on whether and how much to pay on an insurance claim." *Id.* Consequently, the report "was a customary step in processing an insurance claim. The jury was entitled to conclude that this mailing furthered McClelland's scheme to collect on his fraudulent insurance claim." *Id.* at 708–09.

Mr. Koen asserts that these particular checks retained investigative services that

4. Similarly, in *Pacheco–Ortiz,* 889 F.2d at 305–06, a mailing from an insurance adjuster to the insurer, sent after the underlying claim had been paid and forwarding a copy of a legal pleading, could not support a mail fraud conviction. The court reasoned that the mailing was not in furtherance of the scheme because the claim had been paid and the mailing may only have served to increase the possibility that the scheme would unravel.

made it more likely that his fraud would be detected. Consequently, the checks worked against the success of Mr. Koen's scheme, not in furtherance of it. Thus, he argues that they cannot support a conviction for mail fraud. The government counters by arguing that testimony in the record shows that USF & G sent these checks as part of its normal procedure for processing an insurance claim like the one on the Security Bank building. Consequently, the checks did work in furtherance of the scheme "because [Mr. Koen] would not be entitled to any insurance proceeds until it was determined that he did not commit arson." Appellee's Br. at 35.

While the persons retained by USF & G's checks, particularly the claims adjusters and the fire investigators, ultimately may have hastened the uncovering of the fraud, we do not believe that this factor necessarily precludes the checks from supporting mail fraud convictions. In *Schmuck v. United States,* 489 U.S. 705, 715, 109 S.Ct. 1443, 1449, 103 L.Ed.2d 734 (1989), the Supreme Court stated that

> [t]he relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive and return to haunt the perpetrator of the fraud. The mail fraud statute includes no guarantee that the use of the mails for the purpose of executing a fraudulent scheme will be risk free. Those who use the mails to defraud proceed at their peril.

At Mr. Koen's trial, a former USF & G official, John Dibble, testified that retaining claims adjusters, investigators, and attorneys was standard procedure when dealing with claims of this type. Tr. at 828, 838. Dibble testified that whenever a claim this large was made and there was evidence of arson, the normal and ordinary course of business was to investigate the loss before any payment to the insured could be made. *Id.* at 827, 838. Additionally, immediately following the fire at the Security Bank building, Mr. Koen and his representatives pressured Dibble's claims office, demanding prompt payment on the insurance policy. Because of this pressure and his duty to investigate the origin of the blaze, Dibble hired the investigators and attorneys. At trial Dibble stated that these people were hired "to investigate the claims in an expedient manner. There were a lot of issues involved, and they were hired to assist me in handling this claim as I handle any claim." *Id.* at 838. Moreover, it is important to note that USF & G's investigation did not prevent it from making advance payments to Mr. Koen and from eventually settling the claim. All of the checks used to retain investigative services here at issue were sent out prior to the final settlement of the insurance claim. Tr. at 835. These factors distinguish, in a significant way, Mr. Koen's case from the result the Sixth Circuit reached in *Castile.* In *Castile,* the insurer never paid on the fraudulent claim. The communications were in execution of a previously established investigation. The insurer's investigations led directly to evidence that the insured had committed arson; thus the investigation could not have furthered the fraudulent scheme. *See Castile,* 795 F.2d at 1279. Mr. Koen, however, would not have received the policy proceeds, as he eventually did, without USF & G first hiring people and services to investigate the fire. Thus, USF & G hired fire investigators, adjusters, and attorneys as a customary precursor to payment of the policy proceeds, not for the sole purpose of defeating Mr. Koen's claim.[5] *See McClel-*

5. It appears that one of these firms, Research Service Bureau, after it was hired, may have focused on the possibility of arson by Mr. Koen:

> [Attorney Tuite]: Now, this Research Service Bureau, while you said that you paid them and you helped settle this claim, what in effect did they do, if you recall?
>
> [Mr. Dibble]: I'm not real clear on that at this point. They—I don't know if I recall. They seemed to track down other information concerning more opportunity and motive than anything else.
>
> Q: So they would be looking to see if they could determine whether or not the defen-

*land,* 868 F.2d at 708. Indeed, according to Dibble's testimony, the insurance company hired these entities in response to Mr. Koen's demand for prompt payment. Their retention, then, was directly related to the scheme as Mr. Koen conceived its unfolding. The investigation was necessary to fulfill Mr. Koen's scheme.

Like the letters in *Kuzniar, Draiman,* and *McClelland,* the USF & G checks furthered the process by which Mr. Koen received the proceeds on the fire insurance policy. As Dibble testified, the size of the claim, the evidence of arson, and the pressure from Mr. Koen for a quick settlement made investigation of the fire a prerequisite to payment and was customary in this kind of circumstance. Thus, the checks sent by USF & G were necessary to the completion of Mr. Koen's fraud. Based on these mailings, the evidence was sufficient to convict Mr. Koen of mail fraud.

B. *The Joinder and Severance Issues*

1. Facts

Mr. Koen was charged in a multiple-count indictment of mail fraud, embezzlement and misapplication of funds, making false representations on a government form, and arson. However, as noted in the beginning of this opinion, these counts fall into three categories. Counts 1, 2, 3, 5, and 6 were known as "the Program Fraud Counts," and concerned crimes that Mr. Koen allegedly committed during the course of administering federally funded programs. Count 7 charged arson stemming from the fire in the Security Bank building. Counts 8 through 25 alleged mail fraud resulting from Mr. Koen's attempt to collect on the fire insurance policy covering the building.

Mr. Koen claims that the district court committed reversible error when it joined Count 5 to the other counts in the indictment. He asserts that there was an insufficient connection between that count and the arson and mail fraud counts to satisfy the requirements of Federal Rule of Criminal Procedure 8(a).[6] In the alternative, he asserts that, even if Count 5 was properly joined under Rule 8(a), the district court abused its discretion by not ordering its severance, as allowed under Federal Rule of Criminal Procedure 14.[7]

In evaluating this claim, it is important to note precisely why Mr. Koen claims that Count 5 was misjoined. Count 5 charged Mr. Koen with embezzling federal funds in 1987 to pay a personal debt on his car lease. In his brief, Mr. Koen admits this count might be properly joined with the other Program Fraud Counts (Counts 1, 2, 3, and 6) "because of transactional similari-

dant, Charles Koen, had anything to do with the fire?

A: Motive and opportunity. I believe that would be a fair statement.

Q: And if you come up with something, something that you might find that you could help legitimately deny the claim?

A: Correct.

Tr. at 842. However, at the time of retention, the purpose was significantly broader:

[Attorney Porter]: And because of this pressure that you've testified about that the defendant and his representatives were putting on you, is that why you hired some of these people that you paid checks to like Walker & Williams, Ritcheson Claims Service and Research Service Bureau?

[Mr. Dibble]: Absolutely, yes.

Q: And was the reason for hiring them simply to detect whether or not Charles Koen had committed any fraud?

A: No. It was to investigate the claim in an expedient manner. There were a lot of issues involved, and they were hired to assist me in handling this claim as I handle any claim.

Tr. at 837–38.

6. Fed.R.Crim.P. 8(a) states that:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

7. Rule 14 provides in part that:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires....

Fed.R.Crim.P. 14.

ty." Appellant's Reply Br. at 10. He also concedes "that most of the [P]rogram [F]raud [C]ounts arguably might be tried with the arson and mail fraud counts because proof of the former could establish motive for the latter." *Id.* at 10–11. Therefore, Mr. Koen is not claiming that Count 5 was misjoined because it bore no relation to any of the other offenses charged in the indictment. Instead, his argument is that joinder of Count 5 was improper because there is an insufficient connection between that count and the arson and mail fraud counts. As support for this contention, Mr. Koen points out that the embezzlement charged in Count 5 took place in 1987, roughly one and a half years after the fire occurred. Consequently, Mr. Koen argues that "[n]othing about the offense charged in [C]ount 5 was pertinent to the proof of any aspect of [C]ounts 7 through 25." Appellant's Br. at 33.

The district court rejected this argument. It ruled first that the Program Fraud Counts, including Count 5, were properly joined with the arson charged in Count 7 because all involved allegations concerning Mr. Koen's control of an organization receiving federal funds, i.e. the United Front. The mail fraud counts, Counts 8 through 25, were properly joined with Count 7 because "the touchstone of the scheme was the destruction by fire of the building housing the United Front...." Supplemental App. to Appellant's Br. at 93. The court also held that joinder of the Program Fraud Counts and the arson and mail fraud counts was proper because they were of "similar character" for the purposes of Rule 8(a): they alleged that Mr. Koen used organizations he controlled to misappropriate funds in violation of federal law. *Id.* at 92–93. The district court also denied Mr. Koen's motion to sever under Rule 14, finding that he had identified no specific prejudice that would befall him if severance were not granted.

2. Analysis

a. joinder

Federal Rule of Criminal Procedure 8(a) allows joinder of charges in three situations: when offenses are (1) of the same or similar character; (2) based on the same act or transaction; or (3) based on two or more acts or transactions connected together or constituting parts of a common scheme or plan. *United States v. Moya–Gomez,* 860 F.2d 706, 766 (7th Cir.1988), *cert. denied sub nom. Estevez v. United States,* 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989). On appeal, we review de novo whether joinder is proper. *United States v. L'Allier,* 838 F.2d 234, 240 (7th Cir.1988). Nevertheless, our cases have emphasized that district courts "should construe Rule 8 broadly to allow joinder to enhance the efficiency of the judicial system, ... and to avoid expensive and duplicative trials, if judicial economy outweighs any prejudice to the defendant." *United States v. Archer,* 843 F.2d 1019, 1021 (7th Cir.) (citations omitted), *cert. denied,* 488 U.S. 837, 109 S.Ct. 100, 102 L.Ed.2d 76 (1988).

Under Rule 8, counts may be properly joined if they are "of the same or similar character." Fed.R.Crim.P. 8(a). This standard is met when the counts " 'refer to the same type of offenses occurring over a relatively short period of time, and the evidence as to each count overlaps.' " *United States v. Shue,* 766 F.2d 1122, 1134 (7th Cir.1985) (quoting *United States v. Rodgers,* 732 F.2d 625, 629 (8th Cir.1984)). There is a good deal of merit to the government's common-sense submission that all of the counts charged are of similar character because they all relate to Mr. Koen's mishandling of the funds of the United Front. The arson count is, of course, somewhat of a fulcrum in this regard because it served, from Mr. Koen's perspective two functions. It was an attempt to cover up his previous self-dealing and, at the same time, to profit from the insurance coverage on the facility. It is also important to note that there is a great deal of temporal and evidentiary overlap with respect to these charges that makes the decision to try them together especially justifiable. The indictment states that the embezzlement charged in Count 5 occurred in 1987, some time after the fire. However, the insurance claim on the building was in

the process of being settled during that time. While the evidentiary overlap between this particular embezzlement charge and the arson and mail fraud charges may not have been of prime importance, we cannot say that the commission of the Count 5 embezzlement must be considered irrelevant in the establishment of either motive or intent for all the other charges.

Joinder of the Count 5 embezzlement was also proper under another of the Rule 8(a) alternatives. It was properly joined with the arson and mail fraud counts because the counts are all "based ... on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Fed.R.Crim.P. 8(a). In *United States v. Berardi,* we held that

> "[t]ransaction" is a word of flexible meaning and "may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." ... In determining whether the connection between the acts charged is sufficient to meet the requirements of joinder under Rule 8(a), the court should be guided by the extent of evidentiary overlap.

675 F.2d 894, 899–90 (7th Cir.1982) (citations omitted). *See also United States v. Balzano,* 916 F.2d 1273, 1280 (7th Cir.1990) (upholding joinder of witness intimidation count with extortion and RICO conspiracy counts and stating that "witness intimidation count was clearly part and parcel of the same criminal scheme"); *United States v. Raineri,* 670 F.2d 702, 708 (7th Cir.) (noting that evidentiary overlap guides joinder analysis), *cert. denied,* 459 U.S. 1035, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982). As we have already noted, the Count 5 embezzlement and the arson and mail fraud counts all relate to Mr. Koen's alleged mishandling of the funds of the United Front and his attendant financial distress. Evidence detailing his operation of the organization and his financial problems would be relevant to establishing motive for embezzlement, arson, and mail fraud. Moreover, the fact that Mr. Koen may have committed embezzlement would be especially relevant to establishing a motive to commit later acts of mail fraud. A "logical relation" exists between the offenses.[8]

We conclude that the joinder of Count 5 with the other counts was proper under Rule 8(a). Furthermore, even if the district court's joinder of the counts was in error, misjoinder is reversible only if it results in substantial prejudice to the defendant. *United States v. Anderson,* 809 F.2d 1281, 1288 (7th Cir.1987) (citing *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986)). Mr. Koen's conclusory allegations in this regard are insufficient.

b. severance

Mr. Koen also contends that, even if the joinder of Count 5 was proper under Rule 8, the district court nonetheless abused its discretion when it refused to sever the charge pursuant to Federal Rule of Criminal Procedure 14. Rule 14 authorizes the district court to grant a severance when it appears that a defendant's trial will be prejudiced by the joinder of either offenses or defendants. *See United States v. Doerr,* 886 F.2d 944, 971 (7th Cir.1989). We review a district court's order regarding severance for an abuse of discretion. *United States v. Hartmann,* 958 F.2d 774, 786 (7th Cir.1992); *United States v. Coch-*

8. *See Berardi,* 675 F.2d at 900 (upholding joinder of counts because extortion and mail fraud counts tended to show motive for obstruction of justice charge); *United States v. Isaacs,* 493 F.2d 1124, 1158–59 (7th Cir.) (perjury, conspiracy, Travel Act, and mail fraud violations were properly joined; "[t]hey are all connected with, or arose out of, a common plan to corruptly influence the regulation of horse racing. The perjury charge against Kerner related to his involvement with the racing industry, and evidence of that involvement was pertinent to the proof of the other offenses."), *cert. denied sub nom. Kerner v. United States,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974), *overruled on other grounds by United States v. Gimbel,* 830 F.2d 621 (7th Cir.1987); *see also United States v. Fagan,* 821 F.2d 1002, 1007 (5th Cir.1987) (stating that mail fraud counts were properly joined with interstate threat and witness intimidation counts, because threat and intimidation were related to fraud scheme), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988).

*ran,* 955 F.2d 1116, 1120 (7th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 460, 121 L.Ed.2d 368 (1992). To mandate reversal, the abuse of discretion must relate to a showing of actual prejudice to a defendant. *United States v. Oakey,* 853 F.2d 551, 555 (7th Cir.1988), *cert. denied,* 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 977 (1989). As we have noted:

> Rule 14 permits the trial court, in the exercise of its discretion, to grant separate trials when the interests of justice so require. A district court's ruling on a Rule 14 severance motion will be overturned only upon a showing of abuse of discretion.... Because the balancing of the cost of conducting separate trials and the possible prejudice inherent in a single trial is best conducted by the trial court, the defendant bears an extremely difficult burden of showing on appeal that the district court abused its discretion.... In order to appeal successfully the denial of a severance motion, a defendant must establish actual prejudice resulting from the denial.... Actual prejudice means that the defendant could not have a fair trial without severance, " 'not merely that a separate trial would offer him a better chance of acquittal.' "

*Moya-Gomez,* 860 F.2d at 754 (citations omitted); *accord United States v. Leiva,* 959 F.2d 637, 641 (7th Cir.1992); *United States v. Gonzalez,* 933 F.2d 417, 425 (7th Cir.1991); *United States v. Balzano,* 916 F.2d 1273, 1281 (7th Cir.1990).

In his brief, Mr. Koen attempts to demonstrate prejudice from the district court's decision not to sever by pointing out that trial on Count 5 allowed the government to display large photographs of the Cadillac that Mr. Koen leased with the embezzled funds. However, Mr. Koen's representations that these photos inflamed the jury are conjectural. We note that the jury was instructed to consider each count separately and the evidence related to it. *See also Doerr,* 886 F.2d at 972 (stating that limiting instructions protected defendant from prejudice). The district court did not abuse its discretion when it denied severance of Count 5.

C. The Continuance Issue

Mr. Koen next contends that the district court erred when it refused to grant him a continuance after his retained counsel withdrew from representation at the start of trial. We conclude that the district court's handling of this matter was not an abuse of discretion.

1. Facts

Mr. Koen employed a lengthy succession of attorneys as his case headed for trial. Mr. Koen was indicted on August 1, 1989, and was represented initially by James D. Montgomery. Mr. Montgomery was allowed to withdraw as counsel on December 7, 1989, after he informed the court that Mr. Koen could not pay his fees and expenses. On December 7, 1989, attorney Adam Bourgeois filed an appearance on behalf of Mr. Koen. On March 5, 1990, Mr. Bourgeois was granted leave to withdraw as counsel, and he was replaced by attorney H. Nasif Mahmoud. On August 20, 1990, Mr. Mahmoud filed a motion to withdraw, claiming economic hardship. On August 29, the district court appointed the Federal Public Defender and Assistant Federal Public Defender, Phillip Kavanaugh, as additional counsel for Mr. Koen. On October 1, 1990, Mr. Mahmoud was allowed to withdraw as counsel for Mr. Koen. The Federal Public Defender's Office continued to represent Mr. Koen and was told by the court to continue preparing for trial. On October 19, 1990, attorneys Patrick Tuite and Kevin Milner entered appearances on behalf of Mr. Koen. The Federal Public Defender continued its representation in tandem with Messrs. Tuite and Milner.

Mr. Koen's trial date was continued numerous times due at least in part to the constant change of his defense counsel. For example, after Mr. Montgomery's withdrawal, the court continued trial until March 5, 1990. After Mr. Bourgeois' departure, trial was continued until July 9, 1990. After the Federal Public Defender was appointed as counsel, trial was continued again, this time until October 22, 1990. After Mr. Mahmoud was allowed to with-

draw his representation, trial was continued until January 7, 1991.

Trial finally commenced on the morning of Tuesday, January 22, 1991. However, before voir dire began, Messrs. Tuite and Milner moved to withdraw from their representation of Mr. Koen because they believed that he could not pay their fees and expenses. The court granted this motion, apparently after Mr. Koen did not object to their departure. Assistant Federal Public Defender Phillip Kavanaugh remained as Mr. Koen's sole counsel. During the discussion following Mr. Tuite and Mr. Milner's motion to withdraw, Mr. Kavanaugh indicated to the court that he needed additional time to prepare certain aspects of the case, particularly the Program Fraud Counts. Jury selection consumed all of January 22. At the end of proceedings on that day, the court continued trial until Thursday, January 24, in order to allow Mr. Kavanaugh additional time to prepare.[9]

When trial resumed on January 24, Mr. Kavanaugh moved for another continuance to allow him additional time to discuss the evidence with Mr. Koen. The court denied this motion, citing the numerous continuances that it had already granted and the fact that the jury had been selected and witnesses had been called. The evidence presented during trial on January 24 related to the Program Fraud Counts. Mr. Kavanaugh declined to cross-examine several government witnesses and also protested to the court that his cross-examination of others was inadequate because he had not had sufficient time to prepare Mr. Koen's defense on the Program Fraud Counts. However, Mr. Kavanaugh had the option to recall these witnesses later in the trial. The next day, Friday, January 25, the district court adjourned trial at midmorning in order to provide Mr. Kavanaugh an additional opportunity to prepare. Messrs. Tuite and Milner reappeared as counsel for Mr. Koen when trial resumed on Tuesday, January 29, 1991, and they reassumed charge of Mr. Koen's defense.

2. Analysis

Mr. Koen argues that the trial court's decision not to grant a continuance after the initial departure of Messrs. Tuite and Milner was reversible error. He contends that his defense was prejudiced because Mr. Kavanaugh was required to try the case when he was unprepared to do so. However, "this court will overturn a trial court's disposition of a motion to continue only for an abuse of discretion and a showing of actual prejudice." *United States v. Blandina,* 895 F.2d 293, 297 (7th Cir.1989); *accord United States v. Turk,* 870 F.2d 1304, 1307 (7th Cir.1989); *Moya-Gomez,* 860 F.2d at 742; *see also Morris v. Slappy,* 461 U.S. 1, 11, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983) (stating that "broad discretion must be granted trial courts on matters of continuances"). Of course, the "abuse of discretion" standard does not mean no review at all. It simply means that we shall not second-guess the decision of a trial judge that is in conformity with established legal principles and, in terms of its application of those principles to the facts of the case, is within the range of options from which one could expect a reasonable trial judge to select.

In this case, Mr. Koen's claim of error is premised on Mr. Kavanaugh's lack of preparation for trial. We note that

> [w]e have deemed the following factors highly relevant in assessing claims of inadequate preparation time: the quantum of time available for preparation, the likelihood of prejudice from denial, the accused's role in shortening the effective preparation time, the degree of complexity of the case, and the availability of discovery from the prosecution.

*United States v. Studley,* 892 F.2d 518, 522 (7th Cir.1989) (quoting *Blandina,* 895 F.2d at 297).[10] In reviewing a ruling on a con-

9. Mr. Milner and Mr. Tuite previously had represented to the court that they would remain for a day or two to assist Mr. Kavanaugh.

10. *See also United States v. Zambrana,* 841 F.2d 1320, 1327 (7th Cir.1988) (stating that available preparation time, likelihood of prejudice, defendant's role in shortening preparation time, complexity of the issues, and availability of discovery are all important factors in assessing whether counsel's preparation time was adequate);

tinuance, each decision necessarily turns on the facts and circumstances of the case. *United States v. Rodgers,* 755 F.2d 533, 540–41 n. 5 (7th Cir.) (quoting *United States v. Davis,* 604 F.2d 474, 480 (7th Cir.1979)), *cert. denied,* 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985).

The district court's decision not to grant a continuance was not an abuse of discretion, but instead was a sensible and careful reaction to a difficult trial situation. The record establishes that Mr. Kavanaugh had ample time to prepare Mr. Koen's defense. He and the Federal Public Defender's Office were appointed as counsel on August 31, 1990, almost five months before trial began. In October of that year, the district court specifically admonished the responsible attorney to be prepared for trial. We cannot ignore the awkward timing of Mr. Koen's requests for a continuance. His requests were brought at the very start of trial, and after the case already had been continued numerous times. Nonetheless, the court made reasonable efforts to accommodate Mr. Kavanaugh's needs, such as not holding trial on Wednesday, January 23 and by adjourning early on Friday, January 25.

Finally, we do not believe that Mr. Koen has made a sufficient showing of actual prejudice from the denial of the continuance to justify overturning the district court's decision. *See Rodgers,* 755 F.2d at 540–41. In his brief, Mr. Koen asserts that the prejudice he suffered was "fairly palpable." In support of this proposition, Mr. Koen cites defense counsel's failure to cross-examine certain government witnesses on January 24, and his supposed inadequate cross-examination of others. Having reviewed the record, we find that there is an inadequate showing of prejudice. With regard to Mr. Kavanaugh's failure to cross-examine certain witnesses, we find it significant that Mr. Koen has not attempted to set forth with any specificity what facts should have been elicited and would have benefitted his case. While we do not believe that it would be fair to ask appellate counsel to describe in great detail testimony that was never given, it is fair to require that the expected testimony will be set forth in sufficient fashion to allow the reviewing court to determine the matter of prejudice. *See Studley,* 892 F.2d at 523 (7th Cir.1989); *Rodgers,* 755 F.2d at 541 (7th Cir.1985).

D. *Bad Acts Evidence*

Besides being the executive director of the United Front, Mr. Koen was also engaged in several other business enterprises. The record reflects that he was involved in attempting to organize a bank in the Cairo area, that he sold insurance, and that he had a business relationship with a mortgage brokerage firm. Apparently, not all of these enterprises were successful. As noted above, testimony suggests that Mr. Koen and his business entities were approximately $300,000 in debt at the time of the fire.

At trial, the government elicited testimony from several witnesses relating to Mr. Koen's business dealings. On appeal, Mr. Koen challenges the admission of a portion of that testimony. He claims that it dealt with uncharged bad acts, and did not meet the requirements of Federal Rule of Evidence 404(b). In particular, Mr. Koen challenges, first, the admission of testimony that he had lied to a friend and business partner, and perhaps had forged the gentleman's name on a check. Second, he claims that the court erred by admitting evidence purportedly showing that he had promised investors in his bank that their money would be kept in escrow but that he had broken this promise. Third, Mr. Koen challenges testimony suggesting that, in order to gain an extension of time for the bank chartering process, he had overstated to his lawyer the amount of money raised to capitalize the bank. In a related contention, he argues that the district court also erroneously allowed testimony that the FDIC had denied his proposed bank's application for deposit insurance. Fourth, Mr. Koen asserts that the court should have excluded testimony from an insurance company official suggesting that Mr. Koen had sold

*United States v. Bush,* 820 F.2d 858, 859–60 (7th Cir.1987) (same).

bogus policies. Finally, Mr. Koen claims that the court erred in admitting testimony that he had obtained an unauthorized loan in the name of the mortgage brokerage firm with which he was affiliated.

Mr. Koen claims that none of this evidence met the standards for admissibility required by Federal Rule of Evidence 404(b). At the time of his trial, that rule stated:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.[11]

The admissibility of evidence under this rule is governed by a well-established four-part test. Evidence of other crimes, wrongs, or acts may be admitted when:

> "(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice."

*United States v. Lennartz,* 948 F.2d 363, 366 (7th Cir.1991) (quoting *United States v. Scop,* 940 F.2d 1004, 1009 (7th Cir.1991)).[12] We review a district court's decision to admit evidence under Rule 404(b) for an abuse of discretion. *United States v. Schweihs,* 971 F.2d 1302, 1311 (7th Cir. 1992).

Mr. Koen first brings an omnibus challenge to the admissibility of all of this evidence, claiming that the court erred in concluding that the probative value of the evidence was not outweighed by its prejudicial effect. In assessing this argument, we note that "[w]e accord a trial judge's assessment of relative probative value and unfair prejudice 'great deference because of his [or her] firsthand exposure to the evidence and * * * familiarity with the course of the trial proceeding.'" *Scop,* 940 F.2d at 1009 (quoting *United States v. Briscoe,* 896 F.2d 1476, 1498 (7th Cir.), *cert. denied sub nom. Usman v. United States,* 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990)). Mr. Koen does not dispute that this evidence tends to establish his indebtedness, and consequently his motive to engage in the offenses for which he was charged. He does claim, however, that there were adequate means available to establish his motive without introducing this evidence. Therefore, its real probative value was slight and was outweighed by its prejudicial effects on the jury. We disagree with this argument for several reasons. First, we are not convinced that this evidence had little probative value. While the government may have been able to prove the fact of Mr. Koen's indebtedness without it, this evidence nonetheless conveyed important information relating to the nature of Mr. Koen's debts. For example, it tended to show to whom Mr. Koen owed money, on what terms, and with what prospects of repayment. As the district court remarked when ruling on the admissibility of a portion of this evidence, this information helped "complete the picture" in the jury's mind of Mr. Koen's financial condition. Tr. at 647.

11. Effective December 1, 1991, Rule 404(b) was amended to read as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed.R.Evid. 404(b).

12. *Accord United States v. Goodapple,* 958 F.2d 1402, 1406–07 (7th Cir.1992); *United States v. Monzon,* 869 F.2d 338, 344 (7th Cir.), *cert. denied,* 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989).

Likewise, we do not believe that the district court abused its discretion in concluding that the prejudicial effects of this evidence did not outweigh its probative value. First, with regard to the evidence that Mr. Koen may have told investors that their money would be kept in escrow, we note that Mr. Koen cites in his brief only one instance in which a witness may have testified on the issue of the escrow, and then only obliquely. The district court sustained an objection to this question made by Mr. Koen's counsel. In addition, we cannot disagree with the district court's assessment that the testimony relating to the "bogus" insurance policies was volunteered by the witness. In response to this testimony, the district court offered to give a limiting instruction to the jury, Tr. at 673–74, which Mr. Koen apparently never requested. The prejudice created by the remaining evidence does not appear unduly great. To the extent that prejudice existed, it would have been alleviated in part by the court's instruction to the jury that Mr. Koen was not on trial for any acts other than those charged in the indictment. Tr. at 1198; *see also United States v. Harvey,* 959 F.2d 1371, 1374 (7th Cir.1992) (stating that trial court properly gave jury instruction limiting use of testimony thus curing any prejudice due to admission of that evidence); *United States v. Robinson,* 956 F.2d 1388, 1396 (7th Cir.1992) (same), *cert. denied,* — U.S. —, 113 S.Ct. 654, 121 L.Ed.2d 581 (1992). The district court, therefore, did not abuse its discretion in concluding that this evidence was not so prejudicial as to be inadmissible.

Mr. Koen also asserts that the admission of the evidence relating to the unauthorized loan and the bogus insurance policies violated other aspects of Rule 404(b). These contentions do not merit extended discussion. Mr. Koen complains that evidence of the unauthorized loan was inadmissible under Rule 404(b) because the government did not establish that the loan was, in fact, unauthorized. *See United States v. Goodapple,* 958 F.2d 1402, 1406–07 (7th Cir.1992). However, one of the owners of the firm in whose name the funds were borrowed testified that Mr. Koen did not have the authority to place the company in debt. This showing was sufficient to satisfy Rule 404(b)'s requirement that the government present sufficient evidence to support a finding by the jury that the defendant committed the similar act. *See Huddleston v. United States,* 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988); *United States v. Monzon,* 869 F.2d 338, 344 (7th Cir.), *cert. denied,* 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989).

With regard to the bogus insurance policies, Mr. Koen claims that evidence relating to the policies was inadmissible because there was insufficient proof to establish that the policies were sold close in time to the crime charged. We do not, however, believe that the district court's handling of this evidence constituted an abuse of discretion. As noted above, the testimony relating to these policies was volunteered by the witness[13] and the court offered to remedy any prejudice this caused by providing a limiting instruction to the jury. Mr. Koen appears not to have requested that instruction.

E. *References to Mr. Koen's Decision not to Testify*

Mr. Koen contends that, during cross-examination of his wife, Clydia Koen, the government impermissibly referred to Mr. Koen's decision not to testify at trial. The challenged questioning took place at the beginning of Mrs. Koen's cross-examination and reads as follows:

> [Assistant United States Attorney]: Mrs. Koen, from what you've told us about your husband, he's pretty good about standing up for himself when people put him down, is he?
>
> [Mrs. Koen]: Yes, he is.

13. In addition, our review of the record indicates that this witness discussed Mr. Koen's indebtedness to the insurance company at the time the fire occurred, thus suggesting a temporal connection between the alleged bogus sales and the offenses charged in the indictment. Tr. at 660–61.

Q. And when he's right, he's going to stand up and say so?

A. Oh, yes.

Tr. at 1091. Mr. Koen made no simultaneous objection to these questions. However, he did raise an objection to them in his post-trial motions.

 The Fifth Amendment to the Constitution guarantees every criminal defendant the right to refuse to testify in his or her own defense. *Freeman v. Lane,* 962 F.2d 1252, 1259–60 (7th Cir.1992). As a corollary to this right, the Fifth Amendment also prohibits a prosecutor from referring to a defendant's refusal to testify. *Griffin v. California,* 380 U.S. 609, 614–15, 85 S.Ct. 1229, 1232–33, 14 L.Ed.2d 106 (1965). A direct statement that the defendant has not testified—the type of reference at issue in *Griffin*—is clearly a constitutional violation. *Id.* In this case, however, the challenged questions by the prosecutor are, at best, an indirect reference to Mr. Koen's decision not to testify. A statement that only indirectly refers to the defendant's silence will violate the Fifth Amendment only "if 'the language appears manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " *United States ex rel. Lee v. Flannigan,* 884 F.2d 945, 954 (7th Cir.1989) (quoting *United States v. DiCaro,* 852 F.2d 259, 263 (7th Cir.1988)), *cert. denied,* 497 U.S. 1027, 110 S.Ct. 3277, 111 L.Ed.2d 786 (1990); *see also Freeman,* 962 F.2d at 1260 n. 6 (collecting cases); *Goodapple,* 958 F.2d at 1405 (stating that an indirect comment on defendant's refusal to testify will violate the Fifth Amendment "only if the comment causes the jury to necessarily and naturally draw the inference of defendant's guilt"); *Williams v. Lane,* 826 F.2d 654, 664 (7th Cir.1987) (same).

We do not believe that the prosecutor's questions, although perhaps ill-advised, were "manifestly intended" or were of such character that the jury "would naturally and necessarily" take them to be a comment on Mr. Koen's silence. The government argues that the questions at issue related to prior testimony by a fire investigator regarding Mr. Koen's initial denial of involvement in the arson. Tr. at 494–96; 1143–44. Having reviewed the record, we agree that these questions could have been seen as a reference to the fire investigator's comments. Within the context of this case, it does not appear that the prosecutor's questions were manifestly intended as, or naturally would have been taken by the jury as, comments on Mr. Koen's refusal to testify. *See Lee,* 884 F.2d at 954. In addition, any prejudice to Mr. Koen from the comments would have been mitigated by the court's instruction that the jury was not to draw any adverse inferences from Mr. Koen's failure to take the stand. Accordingly, we conclude that the prosecutor's questions were not in violation of Mr. Koen's Fifth Amendment rights.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.