**UNITED STATES Of America, Plaintiff–Appellee,**

v.

**Russell PREVATTE and Robert A. Soy, Defendants–Appellants.**

**Nos. 92–3370, 92–3535.**

United States Court of Appeals, Seventh Circuit.

Argued June 10, 1993.

Decided Feb. 15, 1994.

Andrew B. Baker, Jr. (argued), Ronald J. Kurpiers, Asst. U.S. Attys., Dyer, IN, for plaintiff-appellee.

Suzanne Philbrick (argued), Chesterton, IN, for defendant-appellant in No. 92–3370.

Robert D. Truitt (argued), Daniel R. Goeglein, Lyons & Truitt, Valparaiso, IN, for defendant-appellant in No. 92–3535.

Before ALDISERT,* CUDAHY, and RIPPLE, Circuit Judges.

---

* The Honorable Ruggero J. Aldisert, United States Circuit Judge for the Third Circuit, is sitting by designation.

RIPPLE, Circuit Judge.

Russell Prevatte and Robert Soy were convicted on fourteen counts of explosives and firearms violations arising from a bombing-burglary scheme that they led in conjunction with three other men.[1] Among these convictions, Prevatte and Soy were found guilty of conspiracy to violate 18 U.S.C. § 844(i), damaging a building in interstate commerce by means of an explosive. They were also convicted of a violation of 18 U.S.C. § 844(i) that resulted in death. For this last count, the district court sentenced Prevatte and Soy to life. Prevatte and Soy appeal. We now affirm the convictions but remand for resentencing.

I

BACKGROUND

A. *Facts*

Russell Prevatte, Douglas Bergner, and Jerry Williams were high school friends who, in 1990, began conducting a series of burglaries and attempted others. In 1991, a fourth individual, Robert Soy, joined this threesome. Prior to the bombing-burglary scheme at issue, some of the men had attempted burglaries, with varying degrees of success, at M & G Metals in Chicago, Illinois, a snack shop at Wolf Lake Park in Hammond, Indiana, the Whiting Motor Vehicle License Branch, Nick's Liquors in Hammond, the Oasis Liquor Store in Hammond, and a Hammond currency exchange. Descriptions of these crimes are pertinent to the issues raised on appeal and therefore are set forth in some detail in the following paragraphs.

First, in the summer of 1990, Russell Prevatte, Williams, and Bergner burglarized M & G Metals in Chicago, Illinois. They entered the building through a hole in the wall from an adjacent business. They stole scrap metal, calculators, office equipment, a computer and a shotgun. The second burglary took place at the Wolf Lake Park in Ham-

mond in June 1991 where Williams was working as a security guard. Williams gave the key to Prevatte who went into the snack shop and stole $1000, about $400 of which was kicked back to Williams. Also in the summer of 1991, the Whiting Motor Vehicle License Branch was burglarized. The burglars entered the branch by cutting a hole through the floor from a crawl space that could be entered from the entrance to the upstairs apartments. The burglars tried but were unable to open the safe. Bergner, who lived at the time in an apartment above the License Branch, was told by Prevatte and Soy that they had burglarized it.[2]

On October 26, 1991, Prevatte and Soy picked up Bergner and drove to Nick's Liquors in Hammond where they had previously dropped off a ladder. Prevatte and Soy had Bergner drop them off behind the building, along with an ax and tools. Bergner parked nearby and served as a lookout for Prevatte and Soy, with whom he communicated by way of hand-held radios. Prevatte and Soy chopped a hole in the roof through which they entered and removed a safe containing $20,000.

Near Thanksgiving, Bergner, Soy, Prevatte, and Prevatte's brother, Scott, attempted to burglarize the Oasis Liquor Store in Hammond. Scott Prevatte drove the truck; he dropped Prevatte and Bergner off and parked a few blocks away. They communicated by two-way radios. When a light came on in the apartment next door over Salvino's Restaurant, they believed that they had been discovered and fled. In their hurried flight, they left a sledge-hammer on the roof. A hacksaw blade was later found near the hole in the roof.

Prevatte and Soy then developed the idea of cutting the telephone lines to their burglary target to disable its alarm system. On December 3, 1991, after previously having cut the wires to a Hammond currency exchange, Prevatte, Soy, Bergner, and Scott Prevatte returned to the exchange and threw

---

1. Three other codefendants, Jerry Williams, Douglas Scott Prevatte, and Douglas Bergner pled guilty to various charges pursuant to a plea agreement and testified for the government at trial.

2. Williams did not participate in any of the burglaries between October 1, 1991 and December 20, 1991; he was at this time attending the Indiana Police Academy.

a rock through the window to see if the alarm would go off. Their police scanner revealed that the alarm did not summon the police. Later the police discovered that a rock had been thrown through a window and the telephone lines had been cut at the currency exchange.

As noted earlier, Williams attended the Indiana State Police Academy from October 1, 1991 through December 20, 1991. During that time, he was given information on explosives—how pipe bombs are made and how they are used as diversions for burglaries. He also checked out a book on these subjects from the Academy library. Williams mentioned the book to Prevatte. Prevatte later read the book and the two discussed the use of pipe bombs as diversions for burglaries.

■ On December 23, 1991, the first pipe bomb was detonated in an alley in Hammond. This bombing apparently was designed to gauge the response time of emergency services so that later burglaries could be timed accordingly. The bomb punctured a gas meter some fifty feet away; however, as far as the record discloses, it did not result in fire. The bombing also resulted in the death of Emily Antkowicz, an elderly woman who had come out of her house to a point about thirteen feet from the bomb and was hit by shrapnel. Prevatte and Soy later told Bergner that they had been working on pipe bombs as diversions for burglaries. Soy said that they had made one and tested it by throwing it in an alley in their neighborhood. He also told Bergner that a woman was killed by shrapnel when the bomb exploded.[3]

On December 30, 1991, another bomb was detonated, causing a fire, near a bank of gas meters at Edo's Lounge in Highland, Indiana. When Soy, Prevatte, Bergner, and Scott Prevatte, who were listening on a police scanner, learned that the police and fire

personnel had been dispatched to the scene of the second explosion, they attempted to break into an Aldi's grocery store in Highland. Although Prevatte and Soy stated that they had cut the telephone wires, the alarm sounded when Prevatte kicked in the door. This unexpected event thwarted their plans.

Three other bombings followed. The first of these was early on the morning of December 31, 1991, behind Salvino's Restaurant in Hammond, Indiana. The bomb damaged the restaurant and an adjacent house. The next bomb was set near gas meters of a multi-family apartment on Harrison Street in Hammond. The bomb caused extensive damage but did not result in a fire. In conjunction with this bombing, the defendants had planned to burglarize a currency exchange, but abandoned the plan because there was a great deal of traffic at the currency exchange. On January 5, 1992, a final bomb was set off near gas meters of apartments in Hammond, Indiana. Following this bombing, the group broke into an Aldi's grocery store, again through a hole in the roof. However, they were unsuccessful in their attempt to open the safe.

During the course of these bombings, Williams apprised the defendants of police investigations. As a probationary police officer, he could monitor police investigations and the deactivation of alarm systems. It was Williams who tipped off the defendants that Prevatte's name was first linked to the bombings. When this occurred, Williams advised the defendants to get rid of evidence and they did so. This brush with justice, however, did not put an end to the group's activities. On January 15th, there was a burglary of McDonald's, on January 23rd another burglary of McDonald's, on January 25th an attempt on a Service Merchandise in Chicago, on February 8th a burglary of a Taco Bell in Hammond, and on February

---

**3.** No claim is made on appeal that this bombing was without the interstate commerce nexus required under 18 U.S.C. § 844(i). However, in *United States v. Stillwell*, 900 F.2d 1104, 1110 n. 2 (7th Cir.), *cert. denied*, 498 U.S. 838, 111 S.Ct. 111, 112 L.Ed.2d 81 (1990), this court held that the adequacy of the interstate commerce nexus was jurisdictional. This court also held in *Stillwell* that the bombing of a private home supplied by natural gas from outside the state had a

sufficient nexus to interstate commerce under § 844(i). *Id.* at 1107 (stating that "Congress intended § 844(i) to reach a private residence which is supplied with interstate natural gas"). We are constrained to follow *Stillwell* as the law of this circuit. There was evidence of record that the bombings had caused damage to gas meters and had caused leaks of gas that had traveled through interstate pipelines. Tr. VI at 813; tr. VII at 1228.

10th and 16th, the cutting of telephone cables in Hammond. These incidents were characterized by the use of walkie-talkies and a police scanner, the attempt to enter buildings using an ax, and the cutting of telephone wires. The group also committed a robbery of Colfax Liquors in February 1992. According to the record, Prevatte, Soy, and Scott Prevatte entered the store, battered the clerk, and took the cash register. The record reveals little else about this incident.

On February 16, 1992, the Prevatte brothers were arrested. A search of their truck recovered a police scanner, wire cutters, tin snips, gloves, hacksaws, axes, and flashlights. Scott was held in custody after his arrest and began to cooperate with police investigations. He told investigators where the bombing materials had been deposited and the agents recovered many of the articles described by Scott. In addition, Scott taped conversations with the other defendants. Finally, agents from the Bureau of Alcohol, Tobacco, and Firearms executed a search warrant for the cottage behind the Prevatte home. The search revealed much evidence pointing to the manufacture of pipe bombs that matched the fragments recovered from the bomb scenes.

## B. *District Court Proceedings*

Based on this evidence, a grand jury returned a twenty-one count indictment against Prevatte and Soy. Specifically, the grand jury charged the defendants with the following offenses:

1. Conspiracy to maliciously damage or destroy property by means of an explosive under 18 U.S.C. § 844(i).

2. Maliciously damaging or destroying property by means of an explosive under 18 U.S.C. § 844(i). (Five counts)

3. Possession of a firearm in violation of 26 U.S.C. §§ 5845(f), 5861(c) and 18 U.S.C. § 2. (Ten counts)

4. Making a firearm in violation of 26 U.S.C. §§ 5845(f), 5861(f) and 18 U.S.C. § 2. (Five counts)

The indictment for the conspiracy not only alleged overt acts in furtherance of the bombings, but also stated that: "It was a further part of said conspiracy that RUSSELL 'RUSTY' PREVATTE and ROBERT A. SOY agreed to utilize a series of pipe bombings as a diversion for burglaries." R.1 at 3. The indictment for the conspiracy named two burglaries and one attempted burglary corresponding to the dates of three of the five bombings.

During trial, the government introduced evidence of the uncharged crimes, described above, that occurred before, during, and after the dates of the alleged bombing-burglary conspiracy. The defendants filed a motion in limine to exclude this evidence. They argued that the acts were not overt acts identified in the indictment as part of the conspiracy. Additionally, they continued, this evidence was offered only to show propensity to commit crimes and therefore was not admissible under Federal Rule of Evidence 404(b).[4] The district court denied the motion. It stated:

The Court finds that the uncharged crimes in issue are probative in proving the defendants' motive as well as their preparation and plan in committing a series of burglaries and/or robberies. The defendants' motive behind the uncharged crimes of burglary and robbery is financial gain which is the same motive for the conspiracy charged in the indictment.

Further, the modus operandi or plan in committing the uncharged crimes is similar or are the same to the modus operandi in the burglaries connected to the pipe bombings. The defendants used the same or similar tools and implements, namely hacksaws, long-handled wire cutters, short-handled tin snips, ladders and gloves to commit the uncharged crimes and the charged crimes.

Further, both crimes involve cutting alarm or telephone wires, communicating through walkie-talkies, utilizing a police

---

**4.** Rule 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity

therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

scanner to avoid detection and the preferential mode of entry was through the roof. Moreover, the wire cutters—cuttings showed the defendants' preparation to commit a robbery or burglary.

Tr. IV at 503–04.

Also at trial, Prevatte attempted to have his mother testify regarding a conversation she had with his brother, Scott. The district court sustained the government's objection to this hearsay testimony. Counsel for Prevatte then made the following offer of proof:

> [Mrs. Holder] asked [Scott] did "Rusty" do the things he is being accused of and that you're saying he did? And that Scott would say no.
>
> Additionally, ... she would testify that ... [Scott said] he's scared about testifying; he felt that he was being intimidated somewhat.... And that he really has very limited knowledge about the entire factual situation that he testified to....

Tr. X at 1909–10. Prevatte argued that Scott Prevatte was a government agent, by virtue of his role as defendant-turned-cooperating-witness, and thus his post-arrest statement was an exception to the hearsay rule under Rule 801(d)(2)(D) of the Federal Rules of Evidence [5] as an admission of a party-opponent.

A jury convicted Prevatte and Soy on fourteen of the twenty-one counts including the violation of 18 U.S.C. § 844(i) which resulted in the death of Emily Antkowicz. Counsel for the defendants argued that, under the Sentencing Guidelines, the district court should apply the guideline for Second Degree Murder as the one most closely analogous to the conviction. The district court disagreed. It reasoned accordingly:

> The Court after hearing argument and after reviewing the guidelines and the materials presented by counsel, finds that the December 23, 1991, bombing was an act of arson since it involved destruction of property. The bomb was placed in an area

close to property and it was foreseeable that it would damage and destruct the property by usage of the explosives.

> The Court further finds that the bombing was done to perpetrate and/or accomplish further burglaries since the bomb was also intended to determine its force and to measure its reactionary time of police and fire departments so as to assist the defendants in further burglaries. As a result of this bombing, other bombings and burglaries or attempted burglaries were committed.

> Title 18, United States Code, Section 844(i) refers you to Guideline Section 2K1.4C which directs you to the most analogous offense which is 2A1.1. The Court finds that the murder statute, Title 18, United States Code, Section 1111 provides that every murder committed in perpetration or an attempt to perpetrate any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary or robbery is murder in the first degree. Because the offense charged would be arson, this statute must be the most analogous.

> Therefore, the Court also finds that malice and forethought were present at the time and place in question. And further finds that at the time that the bomb was placed, placing it in an alley where there was close proximity of residential homes wherein people lived, people were present, was such that the Court can find the malice and forethought in this case. And further finds that death could have been anticipated as a result of placing the bomb in the location where it was placed.

> The Court therefore denies the defendant's objection and finds that the probation department's assessment of level 43 is correct....

> The Court thus determines that the applicable guidelines are, total offense level

---

5. Federal Rule of Evidence 801(d)(2)(D) states:
(d) **Statements which are not hearsay.** A statement is not hearsay if:
....
(2) **Admission by party-opponent.** The statement is offered against a party and is ...

(D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship
....

43, criminal history category of 1, calling for life imprisonment....

Tr. XIII at 2149–50.

Prevatte and Soy renew their arguments on appeal. They submit that the district court erred in allowing the jury to hear evidence of the uncharged crimes. In addition, Russell Prevatte challenges the district court's determination that his mother's testimony was inadmissible. Finally, they dispute the district court's sentencing determination on two grounds. First, they challenge the district court's decision that the guideline for first degree murder, U.S.S.G. § 2A1.1, provides the most closely analogous guideline. In addition, they argue that under § 844(i), life sentences may be imposed only after a jury recommendation, pursuant to 18 U.S.C. § 34. We address each of these in turn.

## II

## ANALYSIS

### A. *The Merits*

The defendants first challenge the introduction of evidence of uncharged crimes. These include a number of attempted and completed burglaries that occurred before, during, and after the time of the conspiracy. In addition, the government introduced several instances of wire-cuttings, stolen property, and insurance fraud. The defendants argue that the uncharged acts cannot be considered overt acts for the purposes of the conspiracy and therefore cannot be admitted on that basis. Additionally, they contend that the acts are not evidence of motive, preparation, plan, or identity, and therefore are not admissible pursuant to Federal Rule of Evidence 404(b). We evaluate each of these in turn.

The defendants' first argument need not detain us long. The district court did not admit the uncharged acts as overt acts of the conspiracy.

What I'm concerned about, Mr. Kurpiers, and I was going through the overt acts, is whether or not the acts you claim are uncharged overt acts can be considered uncharged overt acts.... I was quite con-cerned with it before. That's why I decided to go under 404(b) as opposed to the uncharged overt act.

.    .    .    .    .

Tr. V at 586. Because the district court was concerned that the acts may not be admissible as overt acts in furtherance of the conspiracy, it rested the decision to admit the acts on the alternate ground of their compliance with the requirements of 404(b). Thus, the defendants cannot assert error on the basis that the uncharged bad acts were admitted because they constituted overt acts. We turn, then, to their alternate submission that the admitted evidence does not meet the requirements of Rule 404(b).

■ First, we note our standard of review for this type of evidentiary ruling. "We review a district court's decision to admit evidence under Rule 404(b) for an abuse of discretion." *United States v. Koen*, 982 F.2d 1101, 1116 (7th Cir.1992). In making this determination, we "shall not second-guess the decision of a trial judge that is in conformity with established legal principles," *id.* at 1114; instead we inquire whether the decision made by the trial court "is within the range of options from which one could expect a reasonable trial judge to select," *id.*

■ The admissibility of evidence under Rule 404(b) is governed by a four-prong test. Under Rule 404(b), evidence of other crimes, wrongs, or acts may be admitted when:

"(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice."

*Id.* at 1116 (quoting *United States v. Lennartz*, 948 F.2d 363, 366 (7th Cir.1991)). We evaluate the introduced bad acts according to the above criteria.

1.

■ We must first determine whether the evidence was introduced for one of the reasons articulated in 404(b), or whether it was introduced to show propensity to commit the crime charged. We look to the various reasons enumerated in 404(b) to guide our analysis.

a. modus operandi

In admitting the uncharged crimes at issue, the district court stated:

Further, the modus operandi or plan in committing the uncharged crimes is similar or are the same to the modus operandi in the burglaries connected to the pipe bombings. The defendants used the same or similar tools and implements, namely hacksaws, long-handled wire cutters, short-handled tin snips, ladders and gloves to commit the uncharged crimes and the charged crimes.

Tr. IV at 504. The defendants maintain, however, that in order to fall within the 404(b) modus operandi provision, the uncharged acts must have included a bombing. We cannot agree.

The indictment carefully described the alleged conspiracy. It also articulated the relationship between the bombings and certain burglaries, as well as the ways these burglaries or attempted burglaries were effected. The indictment states:

6) It was further part of said conspiracy that RUSSELL "RUSTY" PREVATTE and ROBERT A. SOY agreed to utilize a series of pipe bombings as a diversion for burglaries.

. . . .

21) It was a further part of said conspiracy that DOUGLAS BERGNER, RUSSELL "RUSTY" PREVATTE and ROBERT A. SOY would obtain and carry with them walkie-talkies, a police scanner, wire cutters, long handled bolt cutters, saws,

gloves, a ladder, a hacksaw and blades, sledge hammers, axes and lock picks.

R.1 at 3, 5–6.

The defendants conceded "that those actions occurring in direct connection with the bombings, under the theory of the Government's case are admissible (those being the Aldi's robberies and the November Oasis Liquors burglary)." Appellant Soy's Br. at 16.[6] These break-ins and attempted break-ins were characterized by the elements listed in the indictment. The attempted burglary at the Oasis Liquor Store involved the parties' communicating by two-way radios; furthermore, a sledge hammer and hack-saw later were found on the roof, presumably for the purpose of entry. The December 30, 1991 burglary at Aldi's included the cutting of telephone wires and the use of a police-scanner. The January 5, 1992 burglary at Aldi's involved the use of hack-saws to make a hole in the roof and involved communication by two-way radios.

Similarly, many of the uncharged crimes at issue shared these characteristics. The burglaries at the Whiting Motor Vehicle License Branch, Nick's Liquors in October and December 1991, the attempted burglary of Service Merchandise, and the burglary of Taco Bell all were attempted through a hole cut in the roof, wall, or floor. Walkie-talkies were used at least for the burglary of Nick's Liquors in October 1991 and for the burglaries of the two McDonald's and the attempted burglary of Service Merchandise in January 1992. Finally, the majority of the burglaries and attempted burglaries after November 1991 were characterized by the cutting of phone wires to disarm alarm systems and the use of police scanners to determine whether the defendants had been successful in their wire cutting. Thus, there is substantial similarity between the uncharged attempted burglaries, including several wire cuttings, and the attempted burglaries and burglaries that were made a part of the indictment. The uncharged acts reveal the modus operandi by which the defendants were to accomplish the bombing-burglary scheme charged in the indictment.

---

**6.** Defendant Prevatte adopted defendant Soy's arguments in toto.

### b. scheme and background

The district court determined that the uncharged crimes at issue were not only probative of the modus operandi, but also the underlying preparation and scheme for the bombing-burglary conspiracy. We agree that several of the pre-conspiracy crimes are admissible on this basis, specifically the burglary at M & G Metals, the Wolf Lake Park burglary, and the attempted burglary of the Whiting License Branch. We have upheld district courts' decisions to admit evidence of prior bad acts when those acts show the formation of the conspiracy or the prior relationship between conspirators.[7] These acts demonstrate how the conspiracy at issue developed. Williams was involved in each of the first two burglaries. This involvement evidences why he continued to involve himself in criminal activity after being hired by the Hammond Police Department. Furthermore, the attempted burglary at the Whiting License Branch was the first time Soy joined the group and it therefore connects him with the other co-conspirators. Thus, these prior criminal acts evidence how the scheme developed and the general background for the conspiracy.

### c. motive

At trial, the district court determined that the uncharged crimes in issue are probative in proving defendants' motive as well as their preparation and plan in committing a series of burglaries and/or robberies. The defendants' motive behind the uncharged crimes of burglary and robbery is financial gain which is the same motive for the conspiracy charged in the indictment.

Tr. IV at 503–04. The defendants treat this justification as ruse; they argue that "the stated motive, that of 'financial gain' is next to useless in determining whether it was more likely that these Defendants committed the burglaries and the bombings." Appellant Soy's Br. at 15.

■ In the context of Rule 404(b), we believe that district courts should approach a general claim of "financial gain" as a motive with great circumspection. In this case, however, we cannot say that the district court's determination can be characterized fairly as an abuse of discretion. In light of the early successes of this group, the district court was entitled to conclude that knowledge of the motive of financial gain would aid the jury in understanding the reasons for the formation and continuance of the bombing-burglary scheme at issue. In the summer of 1990, Prevatte, Williams, and Bergner burglarized M & G Metals in Chicago. Each gained approximately $300 for one night's work. The following summer, Williams and Prevatte stole $1000 from the Wolf Lake Park. After unsuccessfully trying to raid the safe at the Whiting License Branch, Prevatte, Soy, and Bergner successfully absconded with $20,000 from Nick's Liquors in Hammond. On the record, the jury would be entitled to reason that the group, encouraged by the result of these earlier endeavors, became more audacious and attempted other burglaries. As the group expanded its horizons, it did not limit itself to the methods with which it began. The defendants tested the concept of cutting telephone wires at the Currency Exchange in Hammond and eventually branched out into bombings as diversionary tactics. We cannot say, therefore, that the motive of financial gain, as evidenced by these earlier acts, was without significance to the jury's assessment. In any event, these incidents were also admissible as evidence of modus operandi, scheme, and background.[8]

---

7. *See United States v. Sanders,* 979 F.2d 87, 90 (7th Cir.1992) (holding testimony admissible as showing context of relationship with co-conspirator prior to conspiracy), *cert. denied,* —— U.S. ——, 113 S.Ct. 2367, 124 L.Ed.2d 273 (1993); *United States v. Macias,* 930 F.2d 567 (7th Cir. 1991) (noting evidence of prior drug transaction between defendant and co-conspirator probative of working relationship between the two); *see also United States v. Traitz,* 871 F.2d 368, 389 (3d Cir.) (holding uncharged acts of violence evidence of " 'the background of the charges, the parties' familiarity with one another and their concert of action,' " (quoting *United States v. O'Leary,* 739 F.2d 135, 136 (3d Cir.1984), *cert. denied,* 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 776 (1985), *cert. denied,* 493 U.S. 821, 110 S.Ct. 78, 107 L.Ed.2d 44 (1989))).

8. Three acts listed by defendants do not fit easily into the above categories. First, Jerry Williams testified to Prevatte's theft of a jet ski and their

■ With respect to two acts of uncharged misconduct, we believe that the government failed to establish admissibility. The government introduced one of these acts during the testimony of Officer Thomas of the Hammond Police Department. Officer Thomas testified to pulling over Prevatte in the Lever Brothers Credit Union parking lot for having an expired registration. The relevance of this incident to the crimes at issue is tenuous at best. Nevertheless, we do not think that the defendants were in any way prejudiced by its introduction. In a transcript of over 2000 pages, this incident was described in less than six. In addition, counsel for the defendants brought out on cross that the police officer's concern for criminal activity was unfounded, that no burglary implements were found in the car, and that both defendants were very cooperative with the police. These added elements, in conjunction with the general limiting instruction given by the district court, negate any possibility of prejudice from this isolated incident.

■ We also believe that the government failed to justify the admission of testimony about the Colfax Liquor robbery which occurred after the bombings. The brief allusion to this matter at trial, however, leaves us no doubt that its admission was harmless.

### 2.

A second hurdle which must be cleared is that the acts must be similar enough and close enough in time to be relevant to the matter at issue. The district court found that this criterion had been met. As with the first prong, the district court made explicit findings that the second prong of the *Koen* test was met.

The Court further finds that the acts were similar enough and close enough in time to be relevant to the matter in issue.

The indictment charges a conspiracy to maliciously destroy property by way of a pipe bomb from on or about October, 1991, to—or until February 16, 1991 [sic]. Acts 1, 3, 5, and 24 fall outside of the conspiracy timeframe. But as to the requirement that the uncharged crimes be close enough in time to the charged crimes, the Seventh Circuit has allowed evidence of past acts occurring up to five years prior to the acts charged. . . .

All of the acts that fell outside of the conspiracy timeframe were within a year and four months of the conspiracy timeframe. Further, the acts were similar in nature as they all involved burglaries or robberies which were also charged as part of the conspiracy.

Moreover, the modus operandi was similar for the charged and uncharged crimes except for the explosion of the pipe bombs as charged in the conspiracy.

Tr. IV at 505. We agree. We believe the similarity between the uncharged acts and the burglaries listed in the indictment are laid out adequately in the above discussions. With regard to the temporal proximity of the uncharged crimes, we have held previously that uncharged crimes occurring five years before the charged crime are admissible so long as the evidence shows a pattern of acts. *United States v. Obiuwevbi*, 962 F.2d 1236, 1241 (7th Cir.1992). Here the evidence revealed a pattern of activity; however, unlike in *Obiuwevbi*, all of the activities occurred during the span of only one and one-half years. Thus, we conclude that the acts are sufficiently related to one another substantively and temporally to be admissible.

### 3.

The third prong of the test articulated in *Koen* requires that the evidence must be such that a reasonable jury could find that

commission of two instances of insurance fraud. Although somewhat more attenuated than the burglaries listed above, these acts do establish the affiliation of the parties in the conspiracy and the reasons why the alleged conspiracy may have formed. In addition, we agree with the government that these acts are admissible because defendant Prevatte opened the door. Counsel for defendant Prevatte conceded that the specific instances mentioned could be validly admitted

outside the scope of 404(b) so long as one of the defendants opened the door. This occurred during defendant Prevatte's cross-examination of Williams. On cross, Williams was questioned regarding why he cooperated with the activities of Prevatte and Soy; specifically counsel inquired if they had something on Williams. The counsel for the government on redirect simply resumed this line of questioning to clarify a point already made by counsel for Prevatte.

the act occurred and that the defendant committed the act. The district court found that this prong was met. It stated:

The Court further finds that there is sufficient evidence to support a finding by the jury that the defendants did commit the similar acts as well as the Government has three witnesses, Douglas Prevatte, Douglas Bergner and Jerry witness—Jerry Williams, excuse me, who will testify to these events and at least one of these individuals was present during the commission of these acts.

Further as to the 24th act [the burglary at Colfax Liquors], the Government has an eyewitness who can state that the defendants have the same size and build as the person who robbed him.

Tr. IV at 505.

Defendant Soy concedes in his brief that "the evidence was adequate for the Jury to find by a preponderance of the evidence, which is the required standard, that the act did occur and that the Defendant was the actor." Appellant Soy's Br. at 23. Even without this admission, however, the evidence here would meet the requirement that a reasonable jury could find that the acts occurred and that defendants committed them. The occurrence of these crimes was established by various police officers and eyewitnesses. Furthermore, three witnesses testified to the defendants' involvement in the crimes. Thus, the third prong of *Koen* also is met.

#### 4.

■ The final prong in the *Koen* analysis is that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. In assessing the probative value of evidence admitted under Federal Rule of Evidence 404(b), a reviewing court should "accord a trial judge's assessment of the relative probative value and unfair prejudice great deference." *Koen*, 982 F.2d at 1116. Here, too, the district court made explicit findings:

Lastly, this Court finds that the probative value of the evidence outweighs any danger of unfair prejudice. Even though there are numerous uncharged acts that the Government intends to introduce, it is

the jury's mission to seek out the truth and the facts in this case and this Court finds that justice will be better served with the presentation of this evidence to the jury.

Tr. IV at 505–06.

The crimes at issue were very probative of how the alleged conspiracy developed between the actors, the motive behind the actors' crimes, and the modus operandi for accomplishing the scheme. In addition to the probative value of the evidence, the district court took precautions to prevent prejudice to the defendants. In its instructions to the jury, the district court included the following instruction:

You have heard the evidence of acts of a defendant other than those charged in the indictment. You may consider this evidence only on the question of that defendant's motive, preparation and plan. This evidence [is] to be considered by you only for this limited purpose.

Tr. X at 2039. Furthermore, the district court also cautioned the jury on the weight to be given codefendant testimony, the source for most of the evidence at issue:

Witnesses Jerry Williams, Douglas Bergner and Douglas Scott Prevatte have pled guilty to crimes arising out of the same occurrence for which the defendants are now on trial. You may give their testimony such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care. Moreover, their guilty pleas are not to be considered as evidence against the defendants.

Tr. X at 2037. We have noted that these types of limiting instructions reduce the possibility of unfair prejudice. *United States v. Schweihs*, 971 F.2d 1302, 1313 (7th Cir.1992). Given the precautionary measures taken by the district court, we do not believe that the probative value of the evidence was substantially outweighed by its prejudicial impact.

■ In light of the analysis undertaken by the district court, its specific findings, and its cautionary instructions, we cannot say that the district court abused its discretion in admitting this evidence. Consequently, we

shall not disturb the defendants' convictions on this basis.[9]

## B. *Sentencing*

We review sentences imposed under the guidelines according to a standard of "due deference," 18 U.S.C. § 3742(e);[10] *United States v. Randall,* 947 F.2d 1314, 1320 (7th Cir.1991). However, we review questions of law relating to a sentencing decision de novo. *United States v. Boyer,* 931 F.2d 1201, 1204 (7th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 209, 116 L.Ed.2d 167 (1991). We evaluate the rationale of the district court against these standards.

### 1.

The district court's first step in sentencing was to look to U.S.S.G. § 2K1.4, the guideline for arson and property damage by use of explosives. This guideline does not give a base sentencing level for violations of § 844(i) when death results. Instead, the guideline directs:

If death resulted, or the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from Chapter Two Part A (Offenses Against the Person) if the resulting offense level is greater than that determined above.

U.S.S.G. § 2K1.4(c). Following this directive, the district court looked to Chapter 2 and applied the guideline for first degree murder. It based this consideration on three alternate grounds: 1) that the death of Emily Antkowicz was premeditated; 2) that the death occurred as a part of a general scheme of burglaries; and 3) that it occurred as the result of arson.

The defendants challenge the application of the first degree murder guideline. They contend that the first degree murder guideline is appropriate only in two situations: 1) when the murder is willful, deliberate, malicious, or premeditated, or 2) when the killing is committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or

---

9. In addition to the evidentiary issue dealt with above, defendant Prevatte also challenges the district court's refusal to admit certain hearsay testimony. At trial, the district court refused to allow Mrs. Holder, Prevatte's mother, from testifying as to certain matters that Scott Prevatte told her. The government objected to this testimony on the ground that it was hearsay. Counsel for Prevatte argued that Scott was a government agent and therefore his postarrest statement to his mother was admissible as an exception to the hearsay rule under Federal Rule of Evidence 801(d)(2)(D). We review this evidentiary determination by the court for abuse of discretion only. *United States v. Valencia,* 826 F.2d 169 (2d Cir.1987).

Federal Rule of Evidence 801(d)(2)(D) states:
(d) **Statements which are not hearsay.** A statement is not hearsay if—
. . . .
(2) **Admission by party-opponent.** The statement is offered against a party and is . . . (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

However, courts faced with this issue have refused to apply this provision to government employees testifying in criminal trials based on the rationale that no individual can bind the sovereign. *See United States v. Kampiles,* 609 F.2d 1233, 1246 (7th Cir.1979) ("Because the agents of the Government are supposedly disinterested in the outcome of a trial and are traditionally unable to bind the sovereign, their statements seem less the product of the adversary process and hence less appropriately described as admissions of a party." (citations omitted)), *cert. denied,* 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980); *United States v. Santos,* 372 F.2d 177, 180 (2d Cir.1967) (holding inconsistent out of court statements otherwise admissible not admissible against government in criminal prosecution); *United States v. Durrani,* 659 F.Supp. 1183 (D.Conn.) (citing cases listed above), *aff'd,* 835 F.2d 410 (2d Cir.1987); *cf. Lippay v. Christos,* 996 F.2d 1490, 1497 (3d Cir.1993) (affirming rule for criminal trials but questioning applicability of rule to civil litigation). *But see United States v. Morgan,* 581 F.2d 933, 938 (D.C.Cir. 1978) (questioning applicability of rule when Government had expressed its belief in the statement of the declarant). We see no reason to disturb this longstanding rule. Consequently, it was not an abuse of discretion of the district court to keep out the statements at issue.

10. Section 3742(e) states, in pertinent part:
The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts.

sexual abuse, burglary, or robbery. *See* 18 U.S.C. § 1111. They further urge that the situation at hand does not fit into either of these categories. Prevatte and Soy argue that there is no evidence to support the conclusion that the death of Emily Antkowicz was premeditated. Furthermore, they assert, her death was not the result of burglary because the bomb which killed her was designed only to test the response of emergency services. Finally, they claim that her killing was not committed during the perpetration of arson because, although the bomb exploded, it did not cause fire or burning as is required for arson at common law. Consequently, in their view, the first degree murder guideline should not have been applied to them.

The directive of § 2K1.4 is to use the most analogous guideline from Chapter Two. The district court need not search for an exact match between the conduct under § 2K1.4 and the conduct covered by the guidelines in Chapter Two. According to the language of § 2K1.4, the district court must apply the guideline that is most analogous. Thus, we must determine whether the first degree murder guideline, § 2A1.1, is the most analogous guideline from Chapter Two.

At the outset, we note that we agree with the defendants that the record does not contain sufficient evidence of premeditated murder to justify application of § 2A1.1 on that ground. We have previously considered "malice aforethought" to include a " 'predetermination to commit an act without legal justification or excuse.... A malicious design to injure.... The intentional doing of an unlawful act which was determined upon before it was executed....' " *United States v. Olson,* 846 F.2d 1103, 1115 (7th Cir.) (quoting Black's Law Dictionary 863 (5th ed.

1979)), *cert. denied,* 488 U.S. 850, 109 S.Ct. 131, 102 L.Ed.2d 104 (1988); *see also United States v. Brown,* 518 F.2d 821, 825 (7th Cir.) (approving of jury instruction which stated first degree murder could not be found unless " 'the killing is done after a period of time for prior consideration' "), *cert. denied,* 423 U.S. 917, 96 S.Ct. 225, 46 L.Ed.2d 146 (1975). There was no evidence presented at trial that the defendants planned or determined to kill Emily Antkowicz or any other person. That her death resulted from another predetermined criminal act does not make the death premeditated. Consequently, we cannot agree with the district court that the application of the first degree murder guideline can be justified on the basis of premeditated murder.

Furthermore, we also agree that Emily Antkowicz' death was not committed during the perpetration or attempted perpetration of burglary. All of the evidence at trial supports that the first bomb, which killed Emily Antkowicz, was not designed as a decoy for a burglary; it was designed to test the response time of police and emergency services to a bomb site.[11] Consequently, application of the first degree murder guideline cannot be justified on the basis of the similarity between felony murder based on burglary and the crime at issue.[12]

However, contrary to the defendants' arguments, we believe that the bombing at issue is sufficiently similar to arson to apply the first degree murder guideline on this basis. This conclusion rests on our understanding of the language and history of 18 U.S.C. § 844(i). The legislation that created § 844(i), the Organized Crime Control Act of 1970, was designed to address the increased use of explosives for criminal purposes.[13]

11. Counsel for the United States conceded this point at oral argument.

12. These acts also do not constitute attempted burglary. We have held in the context of robbery that attempt includes the intent to commit robbery in conjunction with an overt act in pursuance of that intention. *United States v. Schramm,* 715 F.2d 1253, 1254 (7th Cir.1983), *cert. denied,* 466 U.S. 930, 104 S.Ct. 1717, 80 L.Ed.2d 189 (1984). We have also noted that " 'preparation alone is not enough, there must be some appreciable fragment of the crime commit-

ted, [and] it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter....' " *Id.* (citations omitted). We do not believe the acts at issue constitute anything more than preparation for future burglaries.

13. The House Judiciary Committee articulated the following concerns which the original act was designed to address:

Bombings and the threat of bombings have become an ugly, recurrent incident of life in

However, Congress soon realized that the statute was not accomplishing these goals.

[The original act] was designed to provide Federal jurisdiction over the criminal use of explosives (e.g., extortion, terrorism, and revenge). The Secretary of the Treasury is authorized to investigate violations of Title XI and to inspect the site of any accident or fire, in which there is reason to believe that explosive materials were involved (18 U.S.C. 846)....

....

The current requirement that the damage be "caused by means of an explosive" results in the allocation of a great deal of investigative resources to proving that fact, even though it has been established that the fire was intentionally set, and the criminal parties may be known. At a hearing on this legislation, a representative of the Department of the Treasury estimated that perhaps 30 percent of the significant arson investigations conducted by BATF have to be discontinued because it appears that proof that the arson was caused by means of an explosive would be too difficult.

A frequent method of burning buildings is by the use of gasoline or other flammable liquids. Several courts have held that gasoline mixed with air is a "mechanical mixture * * * that contains any oxidizing and combustible units * * * in such proportions * * * that ignition by fire * * * may cause an explosion." Several courts, however, haxe [sic] rejected that theory.

H.R. 6454 would allow federal jurisdiction over cases involving the threat to cause damage or the actual damage or destruction to certain types of property started by fire as well as by explosives. The bill would simplify federal prosecution of such cases by eliminating the current need to prove that the damage to the burned property was caused by means of an explosive.

H.R.Rep. No. 678, 97th Cong., 2d Sess. at 1–4 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2631, 2631–34 (footnotes and citations omitted). Under the original statute, federal investigators had no authority to investigate fires and explosions when it was not clear that the conflagration was caused by explosives within the meaning of § 844. Thus, in 1982, Congress amended the statute to give federal authority over the malicious use of explosives or fire. The clear intent of the legislative history of the 1982 act was to equate fire and explosive as equivalent means of destruction for the purpose of federal prosecutions under § 844(i).

Congress intended that the malicious use of explosives and fire under § 844(i) be treated the same, and, we believe, result in the same penalties to those convicted. Our colleagues in the Fifth Circuit have addressed the issue of appropriate penalties, *i.e.* applicable guidelines, for violations of § 844(i) when death results from fire. The Fifth Circuit, in addressing this issue, came to the same result. The court disapproved a district court decision that had applied the involuntary manslaughter guideline when a vio-

---

cities and on campuses throughout our Nation. The absence of any effective State or local controls clearly attest[s] to the urgent need to enact strengthened Federal regulation of explosives.

....

[The] purpose [of this title] is to protect interstate and foreign commerce against interference and interruption by reducing the hazards to persons and property arising from explosives misuse and unsafe or insecure storage. It is also intended to assist the States effectively to regulate explosives distribution within their borders....

....

In addition, in view of the growing and widespread number of bombing outrages, the committee has recommended expanded Federal investigative and prosecutive authority. For

example, a new penalty provision proscribes malicious damage or destruction by means of explosives of any property owned, possessed or used by or leased to the United States (proposed sec. 844(f)).... These provisions are designed to enable the Federal Government to participate more directly in the investigation and prosecution of such offenses. However, it is not the intention of the proposed statute that the Federal Government substitute for the enforcement activities of State and local authorities. Express provision is made that this statute shall not be construed as preempting State law or depriving State or local law enforcement of its responsibilities for investigating and prosecuting crimes involving the use of explosives.

H.R.Rep. 1549, 91st Cong., 2d Sess. (1972), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4013–14.

lation of § 844(i) resulted in a death from fire. It concluded "that the 'most analogous guideline' from Chapter Two, Part A is the first degree murder guideline, § 2A1.1." *United States v. El–Zoubi*, 993 F.2d 442, 449 (5th Cir.1993).

■ We believe that the rationale of *El–Zoubi* is sound; § 2A1.1 is the most analogous guideline when death results from a violation of § 844(i) from use of *fire*. Furthermore, on the basis of our reading of the legislative history, we do not believe the fact that death results from an *explosion*, and not a fire, alters the outcome. As we have noted, Congress intended that fire and explosive be equivalents for purposes of § 844(i). To apply the first degree murder guideline when death results from fire, but to apply a different guideline when death results from explosives, would yield a bizarre result that would thwart congressional intent in enacting the 1982 amendments. If we were to read the statute as the defendants invite us to read it, and hold that a death caused by fire could be punished under the first degree murder guideline but that a death caused by a bomb was to be punished more leniently, we could, no doubt, reach a semantically plausible result. However, such a reading would attribute to Congress a result that would be anything but realistic or rational. We decline to attribute such a result to the legislative branch. Congress understandably equated the killing of a human being by burning and the killing of a human being by explosion.[14] Thus, we conclude that the court correctly

applied the first degree murder guideline.[15] *See also United States v. Martinez*, 16 F.3d 202 (7th Cir.1994) (holding that murder guideline is appropriate when death results from arson but not reaching issue of whether first or second degree murder guideline is appropriate because the district court, although initially applying the guidelines for first degree murder, had departed downward pursuant to Application Note 1 to U.S.S.G. § 2A1.1 on the ground that the death was not caused intentionally or knowingly).

2.

■ After determining the applicable guideline, the district court then calculated the sentence. Guideline § 2A1.1 gives a base offense level of 43. After factoring in a criminal history category, this calculation yielded a sentence of life imprisonment for both defendants. The defendants submit, however, that the district court was without authority to impose a life sentence. Specifically, they contend that this determination must be made by a jury.

We first look at the statutory language to determine who may impose a life sentence for this crime. Section 844(i) provides:

Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or for-

---

**14.** We also note that § 844(i) also manifests a congressional intent to treat offenses within its ambit with the same degree of harshness as situations admittedly within the felony murder rule. The statute explicitly permits, by the incorporation of 18 U.S.C. § 34, for the imposition of the death penalty, a penalty not permitted for second degree murder. This is further evidence of the congressional determination that violations of § 844, whether committed by use of a bomb or fire, were to be equated with offenses under the felony murder statute for purposes of punishment.

**15.** The defendants also argue that the district court, in using the first degree murder guideline, sentenced the defendants to a crime for which they were not charged. They allege:

Essentially, the Court sentenced Mr. Prevatte under the first degree murder statute. [sic] 18

U.S.C. Section 1111, although he was never charged with this crime. As such, he was not given the opportunity to present the jury with a defense to first degree murder; nor was he given the opportunity to have the jury decide upon whether he was guilty of first or second degree murder.

Appellant Prevatte's Br. at 19. We cannot accept this argument. Section 844(i) is not the functional equivalent of first degree murder; it is an arson statute, with severe repercussions for the arsonist whose actions result in death of a human being. The court and jury made the determination required by the statute, nothing more. Nothing in the statutory language or history of § 844(i) suggests that the elements of the offense change when death results, and we shall not impose these additional burdens on the government absent statutory language to the contrary.

eign commerce shall be imprisoned for not more than ten years or fined not more that $10,000 or both; ... and if death results to any person, ... as a direct or proximate result of conduct prohibited by this subsection, shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

Furthermore, 18 U.S.C. § 34 states:

Whoever is convicted of any crime prohibited by this chapter, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life, if the jury shall in its discretion so direct, or, in the case of a plea of guilty, or a plea of not guilty where the defendant has waived a trial by jury, if the court in its discretion shall so order.

■ Courts interpreting § 34 have held that, under the plain language of § 34, a life sentence may not be imposed absent jury direction. This was the conclusion of the Fifth Circuit in *United States v. Williams,* 775 F.2d 1295, 1299 (5th Cir.1985), *cert. denied,* 475 U.S. 1089, 106 S.Ct. 1477, 89 L.Ed.2d 732 (1986):

The district court is without power to impose a life sentence.... Here, ... under the clear meaning of the combination of sections 844(i) and 34, Williams may be sentenced by the district court only to "any

term of years" and not to life imprisonment in the absence of a jury recommendation or jury waiver.... Absent the recommendation of the jury, this sentence was improper and must be vacated and the cause remanded to the district court for resentencing.

*See also United States v. Hansen,* 755 F.2d 629, 631 (8th Cir.) (holding discretion of district court for sentencing is explicitly limited "in this case by the statute which provides that life imprisonment may be imposed only if death results from the defendant's actions and if the jury directs the imposition of the sentence"), *cert. denied,* 474 U.S. 834, 106 S.Ct. 105, 88 L.Ed.2d 85 (1985). Thus, under the language of § 34, a life sentence may not be imposed unless the jury recommends.[16]

However, this does not end our inquiry. We must next determine if the Sentencing Guidelines in any way affect the working of § 34. We believe this determination is guided by our decision in *United States v. Holloway,* 991 F.2d 370 (7th Cir.1993). In *Holloway,* we were asked to evaluate the effect of the Sentencing Guidelines on 18 U.S.C. § 401 which allowed either a fine or sentence to be imposed for contempt. The district court sentenced Mr. Holloway to two years' probation with seven days to be served in home confinement for his contempt conviction.

16. We note that this argument was never raised below. Appellate counsel suggested that this argument was encompassed within the challenges made in trial counsel's "Memorandum of Law in Support of Defendant's Objections to Presentence Investigation." We cannot agree. In that Memorandum, counsel for defendant Prevatte raised several objections to the life sentence suggested by the probation officer. It included one argument, now forwarded by appellate counsel, that the guideline for second degree murder is most appropriate for violations of § 844(i). However, never in that Memorandum was it suggested that a life sentence cannot be imposed absent jury determination of that issue. Because counsel failed to raise this issue below, we must determine whether it falls within the doctrine of plain error.

In *United States v. Newman,* 965 F.2d 206, 212 (7th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 470, 121 L.Ed.2d 377 (1992), this court gave the following definition of plain error: "[Plain error is] not only a clear error, but an error likely to have made a difference in the judgment, so that

failure to correct it could result in a miscarriage of justice, that is, the conviction of an innocent person or the imposition of an erroneous sentence." *See also United States v. Lykes,* 999 F.2d 1144, 1147 (7th Cir.1993) ("We will reverse for plain error 'only when ... convinced that it is necessary to avert an actual miscarriage of justice.' In some circumstances, a defendant could meet this standard by showing the district court's use of an inapplicable version of the guidelines resulted in a more severe sentence than that called for under the correct version." (citations omitted)). Certainly, had the question of life sentence been put to the jury, it could have determined that a sentence of life was not warranted. Furthermore, Congress has determined that only a jury should decide if a life sentence should be imposed for violations of this statute. The judge may not usurp the function of the jury as defined by Congress. We believe that imposition of the sentence by the wrong entity is imposition of "an erroneous sentence" within the meaning of the plain error standard. Therefore, we conclude that it was plain error to impose a life sentence without a jury direction.

Mr. Holloway argued that the guidelines required a fine to be imposed "except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). Consequently, only a fine could be imposed under § 401. The government, on the other hand, contended that 18 U.S.C. § 3551, which states "[a] sentence to pay a fine may be imposed in addition to any other sentence," constituted a pro tanto repeal of the disjunctive sentencing in § 401. We began our analysis with 28 U.S.C. § 994 which,

> in setting forth the duties of the Sentencing Commission, mandates, inter alia, that the Commission shall promulgate sentencing guidelines that are consistent with *all* pertinent provisions of titles 18 and 28 of the United States Code. Therefore, the Sentencing Guidelines cannot trump the edicts of the federal criminal statutes. .
>
> . . . .
>
> Section 3551(b) does state that a fine may be imposed in addition to any other sentence. However, § 3551(a) limits the application of the remainder of that statute and the rest of the chapter dealing with criminal sentences. Defendants are to be sentenced in accordance with the chapter "[e]xcept as otherwise specifically provided." § 3551(a). Such a specific provision appears in 18 U.S.C. § 401. The language of § 401 specifically provides that punishments for contempt must be disjunctive; both imprisonment and a fine may not be imposed for a single offense. Thus, the mandate of § 3551(b) that fines may be imposed in addition to any other sentence cannot apply to violations of § 401.

*Holloway*, 991 F.2d at 373. Thus, we affirmed Mr. Holloway's sentence. We believe this reasoning is applicable to the case now before us. Like § 401, § 34 imposes a limitation on the sentence the district court may impose under the guidelines. Consequently, the district court erred in sentencing the defendants to life without a jury recommendation.

There is yet another reason why we are unable to accept the district court's imposition of a life sentence. We do not believe the district court followed the directives of the Sentencing Commission in Application Note 1 to § 2A1.1. Application Note 1 states:

> The Commission has concluded that in the absence of capital punishment life imprisonment is the appropriate punishment for premeditated killing. However, this guideline also applies when death results from the commission of certain felonies. Life imprisonment is not necessarily appropriate in all such situations. For example, if in robbing a bank, the defendant merely passed a note to the teller, as a result of which she had a heart attack and died, a sentence of life imprisonment clearly would not be appropriate.
>
> If the defendant did not cause the death intentionally or knowingly, a downward departure may be warranted. The extent of the departure should be based upon the defendant's state of mind (e.g. recklessness or negligence), the degree of risk inherent in the conduct, and the nature of the underlying offense conduct. However the Commission does not envision that departure below that specified in § 2A1.2 (Second Degree Murder) is likely to be appropriate. Also, because death obviously is an aggravating factor, it necessarily would be inappropriate to impose a sentence at a level below that which the guideline for the underlying offense requires in the absence of death.

The application note directs the judge to consider, among other things, the mental state of the defendants when the death occurred.[17] However, after determining the applicability of § 2A1.1, the district court did not undertake further analysis of the mental state of each defendant. Without consideration of this factor, and the others articulated in the note, we cannot accept the district court's sentencing determination. *See El-Zoubi*, 993 F.2d at 450 (" 'If the defendant did not cause the death intentionally or knowingly, a downward departure may be

---

17. This factor was brought to the attention of the district court in the presentence report. Indeed, the presentence report states: "Nothing in this investigation has revealed that the death of Emily Antkowicz on December 23, 1991 was intentional or occurred knowingly."

warranted. The extent of the departure should be based upon the defendant's state of mind (e.g., recklessness or negligence), the degree of risk inherent in the conduct, and the nature of the underlying offense conduct.'" (quoting U.S.S.G. § 2A1.1, Application Note 1)); *United States v. Paden,* 908 F.2d 1229, 1233, 1238 (5th Cir.1990) (applying methodology), *cert. denied,* 498 U.S. 1039, 111 S.Ct. 710, 112 L.Ed.2d 699 (1991).

### Conclusion

For the reasons stated above, we affirm the defendants' convictions, but remand to the district court for resentencing.

REMANDED FOR RESENTENCING.